The definitions of Article I are hereby incorporated by reference to the extent necessary to interpret and apply the provisions of this Health Incentive Account Arrangement.

**9.3     Health Reimbursement Accounts**

The Daily Administrator previously established a Health Reimbursement Account for each Employee who participates in the Health Reimbursement Account Program. Unless the Company chooses to establish a trust or other funding vehicle to fund the Health Reimbursement Account Program, no separate fund or account will be maintained for any Health Reimbursement Account, and the benefits provided under the Health Reimbursement Account Program will be funded solely by the general assets of the Employers. A Participant will forfeit the balance, if any, of his Health Reimbursement Account if he is an HSA Eligible Participant for a Plan Year (*e.g.*, enrolls in the high deductible medical plan option under the Medical Program). Such balance once forfeited is not subject to restoration.

**9.4     Employer Contributions**

The Employer will bear the entire expense associated with funding Participants' Health Reimbursement Accounts and will, in its sole and absolute discretion, determine the amount, if any, that will be contributed to each Participant's Health Reimbursement Account, each Plan Year. A Participant may not make contributions to the Health Reimbursement Account Program through the Cafeteria Plan. The Employer and/or Employee will bear the expense associated with continuation coverage under COBRA as described in the applicable Component Program Documents.

**9.5     Amount Allocated to the Health Reimbursement Account Program**

A Participant's Health Reimbursement Account will be increased each Plan Year by the amount, if any, the Employer has elected to contribute to the Health Reimbursement Account Program for such Participant. A Participant's Health Reimbursement Account will be reduced by the amount of any allowable Medical Expense reimbursements paid or incurred on behalf of a Participant pursuant to this Article IX. The sum of the contributions which have been allocated to the Participant's Health Reimbursement Account for a Plan Year plus any amount carried forward from a prior Plan Year minus the reimbursements paid or incurred during the Plan Year at any given point in time will be the amount available to the Participant for the reimbursement of allowable Medical Expenses.

**9.6     Coordination of Payment**

Under certain circumstances, coverage for an allowable Medical Expense may be provided under more than one of the following accounts: (i) a Participant's Health Reimbursement Account and (ii) a Participant's Healthcare Spending Account. When coverage is provided under more than one such account, reimbursement of the Medical Expense will be made from such accounts in the order specified by the Participant.

*In no event, will the total amount reimbursed from such accounts exceed the allowable* amount of the Medical Expense.

**9.7     Carryover of Unused Balance**

Except as provided in the Component Program Documents for the Health Reimbursement Account Program, each Participant is entitled to carryover all or the allowable portion of any unused balance in his Health Reimbursement Account at the end of the Plan Year to the subsequent Plan Year for use in that year, or any future periods in which the Participant remains eligible under the Health Reimbursement Account Program to participate in the Health Reimbursement Account.

**9.8     Forfeitures**

With the exception of during continuation coverage under COBRA, any monies remaining in a Participant's Health Reimbursement Account when the Participant ceases to be eligible to participate in the Health Reimbursement Account Program (and after processing all claims incurred while the Participant was eligible to participate) will be forfeited.  In such event, the Participant will have no further claim to such amount for any reason.

**9.9     Nondiscrimination Requirements**

It is the intent of this Health Reimbursement Account Program not to discriminate in favor of "highly compensated individuals" or "highly compensated participants" as defined in section 105 of the Code in violation of the Code and the rulings and Treasury regulations thereunder.

**9.10    Coordination with Plan Document**

Matters concerning contributions, elections, claims for benefits, and the like will be governed by the general provisions of the Plan and the terms of Component Program Documents for this Health Reimbursement Account Program.

**9.11    Health Reimbursement Account Claims**

(a)     **Reimbursement of Medical Claims**.  Medical Expenses incurred by a Participant that are eligible to be reimbursed under this Article XVII  will be reimbursed even though the submission of such a claim occurs after his participation hereunder ceases; provided that the Medical Expenses were incurred during the period while he was a Participant in the Health Reimbursement Account Program.  Such reimbursement will not exceed the balance of the Participant's Account at the time such allowable Medical Expenses are incurred.  Substantiation of such Medical Expenses must be provided in a form acceptable to the Daily Administrator.  Furthermore, notwithstanding anything herein to the contrary, reimbursement will not be made from the Health Reimbursement Account Program for any amounts that are paid or reimbursed under any health care plan covering the Participant and/or his Spouse or Dependents.

(b)     **Claim Filing Deadline**.  Allowable claims for the reimbursement of Medical Expenses will be paid as soon after a claim has been filed with the Administrative Provider as is administratively practicable; provided that claims must be submitted in the time period provided in the Component Program Documents for the Health Reimbursement Account Program in order to be eligible for

reimbursement.   Any dispute concerning a claim for the reimbursement of Medical Expenses under the Health Reimbursement Account Program will be subject to the claims provisions of Article XI unless otherwise provided in the Component Program Documents.

(c)     **Manner of Payment**.     Reimbursement payments under the Health Reimbursement Account Program will be made directly to the Participant. However, in the Daily Administrator's discretion, payments may be made directly to the service provider.  The application for payment or reimbursement will be made to the Administrative Provider on an acceptable form within a reasonable time of incurring the debt or paying the service.  The application will include a written statement from an independent third party stating that the Medical Expense has been incurred, the date of the Medical Expense, and the amount of such expense, and any other information about the Medical Expenses that may be requested by the Administrative Provider on the reimbursement request form or otherwise.    Furthermore, if required by the Administrative Provider, the Participant will provide a written statement that the Medical Expense has not been reimbursed or is not reimbursable under any other health plan coverage and, if reimbursed from the Health Reimbursement Account Program, such amount will not be claimed as a tax deduction.  The Administrative Provider will retain a file of such applications.

### 9.12   Participant Account Statements

The Administrative Provider will, on a periodic basis, provide each Participant with a statement which includes the balance of his Health Reimbursement Account as well as provide a copy of such information to any Participant who makes a specific written request.

_____

End of Article IX

### ARTICLE X — SUBROGATION

**10.1   Plan's Right of Subrogation or Reimbursement**

The right of subrogation or reimbursement set forth herein will not limit any additional rights of subrogation or reimbursement the Plan may have under the applicable laws of any state to seek repayment of the benefit from the Third Party.

For purpose of this Article X, all references to Participant or Covered Dependent includes all current or former Participants or Covered Persons and anyone on whose behalf the Plan pays benefits, including but not limited to, a personal representative of an estate, a decedent, minor, or incompetent or disabled persons.

**10.2   Plan's Lien Rights**

The Plan will automatically have a lien to the extent of benefits paid by the Plan.  The lien may be enforced against any party who possesses or will possess funds or proceeds representing the amount of benefits paid by the Plan.  The Plan's lien exists at the time the Plan pays benefits, and if a Participant or Covered Dependent files a petition for bankruptcy, the Plan's lien exists prior to the creation of the bankruptcy estate.

**10.3   Amounts Recoverable**

The Plan is subrogated to any right of a Participant or Covered Dependent to recover any and all benefits, which have been paid or are payable—or which are likely (in the opinion of the Committee or Daily Administrator) to become payable under the Plan— and which are related to any Condition for which a Third Party is or may be liable, without regard to whether the payment is characterized as recovery for pain and suffering, mental anguish, punitive damages, or any other basis of recovery other than for medical or other welfare benefits provided by the Plan and regardless of whether the liability of the Third Party is reduced to a recovery as a result of legal proceedings, arbitration, compromise settlement or otherwise.

The Plan's subrogation rights under this Article X will be a first priority claim against all Third Parties and the amount to which the Plan is entitled pursuant to its rights under this Article X will be paid to the Plan before any amounts are paid to the Participant or Covered Dependent, or in the event such amount to which the Plan is entitled is not paid immediately to the Plan, such amount will be segregated and held in constructive trust for the Plan, even if such payment to the Plan will result in a recovery which is insufficient to make the Participant or Covered Dependent whole or to compensate the Participant or Covered Dependent in part or in while for the damages sustained. In addition, the Plan may recover from the amounts recovered from such Third Parties its reasonable costs and attorneys' fees.

The amount to which the Plan is subrogated, or the amount to which the Plan is entitled to reimbursement, will not be limited or reduced because the Third Party is liable only in part, the Third Party's resources or insurance is limited, the Participant has not been fully compensated (*i.e.*, made whole), or to share in a pro rata allocation of a Participant's fees and costs (including attorney fees) incurred in pursuit of a claim (*e.g.*, "common fund doctrine"), or because of any other reason.

**10.4    Limitation on Plan's Recovery**

The Plan's right of subrogation will not exceed either (a) the sum of the amount of benefits paid, payable, or likely (in the opinion of the Committee or Daily Administrator) to become payable under the Plan, plus the Plan's reasonable costs and attorneys' fees, or (b) the total amount of the recovery from Third Parties.  The Plan is not required to pay the Participant or Covered Dependent any part of any recovery it may obtain, even if it files suit in the name of the Participant or Covered Dependent.

**10.5    Enforcement**

To enforce any provision of this Article X, the Committee or Daily Administrator may:

(a)    Bring an action, with or without the Participant's or Covered Dependent's consent, in the name of the Plan, Participant or Covered Dependent against a Third Party or the Third Party's liability carrier or in the case of uninsured or underinsured motorist coverage, the Participant's or Covered Dependent's automobile insurance carrier;

(b)    Join in any action by a Participant or Covered Dependent against a Third Party or the Third Party's liability carrier or in the case of uninsured or underinsured motorist coverage, the Participant's or Covered Dependent's automobile insurance carrier;

(c)    Offset future benefits by amounts which a Participant or Covered Dependent has obtained (or could have obtained with reasonable diligence) from a Third Party or the Third Party's liability carrier or in the case of uninsured or underinsured motorist coverage, the Participant's or Covered Dependent's automobile insurance carrier;

(d)    Bring an action to set aside any settlement agreement entered into without the consent of the Committee or Daily Administrator;

(e)    Give notice of and bring an action against a Participant or Covered Dependent for an equitable lien or constructive trust against amounts recovered by a Third Party;

(f)    Without consent of or notice to any Participant or Covered Dependent, to the extent permitted by law, release to or obtain from any other individual or entity any information which the Committee or Daily Administrator deems necessary or advisable for the enforcement of the Plan's subrogation rights under this Article X; or

(g)    Take any other action it deems appropriate.

**10.6    Obligations of Participants**

In addition to the other obligations set forth in this Article X, the following obligations apply to Participants and Covered Dependents:

(a)    The Participant or Covered Dependent will cooperate with the Committee's efforts to enforce the Plan's rights under this Article X, execute and deliver to the Committee or Daily Administrator, as applicable, any reimbursement agreement,

assignment, and other documents the Committee or Daily Administrator requests for enforcing the Plan's rights under this Article X, will provide to the Committee or Daily Administrator any information regarding recovery sought or received from any third party (including notifying the Plan within 30 days of the date when notice is given to any party of the intention to pursue or investigate a claim to recover damages or obtain compensation and notifying the Plan prior to receipt of recovery funds or within 5 days of the amount and source of such recovery if no notice was given prior to receipt), will not take any action which might prejudice the Plan's rights under this Article X, and will not release any Third Party (even if the release purports to be a partial release or a release for the excess liability over Plan benefits) without the Committee's or Daily Administrator's advance written consent. The Plan's rights will not be affected by a release of any Third Party entered into without such consent.

(b)     If a Participant or Covered Dependent initiates a liability claim against any Third Party or the Third Party's liability carrier, or if recovery is sought against the Participant's or Covered Dependent's automobile insurance carrier under the uninsured or underinsured endorsement, the amounts described in Section 10.2 must be included in the claim.

(c)     If a Participant or Covered Dependent receives money from or on behalf of any Third Party, the Participant or Covered Dependent will hold such money in trust for the Plan, to the extent of the Plan's rights under this Article X, up to and including the full amount of recovery. Failure to do so will constitute a breach of the Participant's or Covered Dependent's fiduciary duty under the Plan.

(d)     If a provider on behalf of and with respect to a Participant or Covered Dependent receives money from or on behalf of any Third Party, a Participant or Covered Dependent will serve as a constructive trustee over those funds, to the extent of the Plan's rights under this Article X, up to and including the full amount of recovery. Failure to do so will constitute a breach of the Participant's or Covered Dependent's fiduciary duty under the Plan.

(e)     No disbursement of any settlement or other recovery funds from any Third Party or other source will be made until the Plan's subrogation and reimbursement interests are fully satisfied.

(f)     Each Participant or Covered Dependent who incurs any Condition will inform the Committee or Daily Administrator whenever it appears a Third Party is or may be liable to the Participant or Covered Dependent as a result of that Condition. Each Participant or Covered Dependent will inform any Third Party, attorney, and insurance carrier, as well as any other individual or entity connected with a Condition or involved in the collection of any amount connected with a Condition, of the Plan's right of subrogation.

(g)     Failure of the Participant or Covered Dependent to comply in all respects with this Article X may, in the Committee's or Daily Administrator's discretion, cause a denial of benefits for a Condition or a termination of coverage for the Participant or Covered Dependent under the applicable Component Program.

**10.7   Jurisdiction**

By accepting benefits under the Plan, all Participants or Covered Dependents submit to any court proceeding with respect to this Article X being brought in any court of competent jurisdiction the Plan may elect.   All Participants or Covered Dependents further submit to each such jurisdiction and hereby waive any rights that may correspond to their present or future domiciles.   By accepting benefits under the Plan, all Participants or Covered Dependents further agree to pay all attorneys' fees the Plan incurs to successfully recover amounts the Plan is entitled to under this Article X.

**10.8   Assignment**

In order to secure the Plan's recovery rights, you agree to assign to the Plan any benefits or claims or rights of recovery you have under any automobile policy or other coverage, to the full extent of the Plan's subrogation and reimbursement claims.   The assignment allows the Plan to pursue any claim you may have, whether or not you choose to pursue the claim.

**10.9   Waiver**

The Committee or Daily Administrator may waive or modify any of the provisions of this Article X whenever it deems appropriate under the facts and circumstances of a particular case.

**10.10   Coordination with Component Program Document**

If a Component Program Document contains subrogation provisions, those provisions will control over this Article X with respect to that Component Program to the extent those provisions are in compliance with the law, including any applicable case law, and are drafted to provide for maximum allowable recovery by the Component Program.

However, if the provisions in the Component Program Document do not address or are ambiguous with respect to a particular issue, and this Article X would address that issue or ambiguity, then this Article X will apply and will control to the extent necessary to resolve the issue or ambiguity.

---

End of Article X

## ARTICLE XI — CLAIMS PROCEDURE

**11.1   Claims For Benefits**

Claims for benefits or reimbursements under the Health Care Components and Disability Component Programs will be determined in accordance with the claims procedures set forth in the Component Program Documents.  Each Health Care Component subject to Health Care Reform as a non-grandfathered plan, as such term is defined in Health Care Reform, will comply with the claims rules applicable to non-grandfather plans under Health Care Reform and such claims rules will be described in the Component Program Documents.

Claims for benefits or reimbursement (other than for health care or disability claims) under the Plan will be submitted and processed in accordance with this Article XI, unless the Component Program Document contains its own claims procedures, in which case the Component Program Document's claims procedures will apply with respect to that Benefit Program.   However, if a non-health or non-disability Component Program Document's claims procedures do not address or are ambiguous with respect to a particular issue, and this Article XI would address that issue or ambiguity, then this Article XI will apply and will control to the extent necessary to resolve the issue or ambiguity.  Further, to the extent that a non-health or non-disability claims procedure does not provide for binding arbitration, the provisions of Section 11.2 will apply.

(a)     **Initial Claim.**  An initial claim for benefits under this Plan or the Component Programs must be filed by a claimant or his duly authorized representative with the Administrative Provider or Daily Administrator, as applicable.  If the claim is denied, the Administrative Provider or Daily Administrator, as applicable, will provide notice to the claimant, in writing, within 90 days after the claim is filed unless special circumstances require an extension of time for processing the claim and notice of the need for an extension is given to the claimant within the initial 90-day period.  Any such extension may not exceed 90 days from the date notice of the claim would otherwise be given.  If notice of the denial of the claim, or need for an extension, is not provided within the 90-day period specified above, then the claim will be deemed denied.  The period of time within which a denial must be made, as described in this Paragraph (a), will begin at the time a claim is filed in accordance with the reasonable procedures of the Plan, without regard to whether all the information necessary to make a benefit determination accompanies the filing.

The notice of a denial of a claim will be written in a manner calculated to be understood by the claimant and will set forth:

(i)      the specific reason or reasons for the denial of the claim;

(ii)     specific references to the pertinent Plan or Component Program Document provisions on which the denial is based;

(iii)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation as to why such information is necessary; and

(iv)     an explanation of the Plan's claim procedure and of the Participant's right to binding arbitration as described in Section 11.2 or to bring a claim pursuant to section 502(a) of ERISA in the event of a final adverse benefit determination.

(b)     **First Level Review**.  The claimant may appeal the denial of his claim for benefits to the Administrative Provider or Daily Administrator, as applicable, within 60 days after receipt of the notice of the denial of the claim or 60 days from the date such claim is deemed to be denied.  In connection with the request for first level review, the claimant or his duly authorized representative may review pertinent documents and submit issues and comments in writing.  The claimant or his duly authorized representative (1) may contact the Daily Administrator to establish a mutually agreeable time during normal business hours of the Employer to review any pertinent documents and (2) will be provided upon request and free of charge, copies of all documents, records, and other materials relevant to the claim for benefits, without regard to whether such documents, records, and other materials were relied upon in making the claim denial.

(c)     **Decision on First Level Review**.   The Administrative Provider or Daily Administrator, as applicable, will issue a decision in writing or electronically on first level review not later than 30 days after receipt of a request for review, unless special circumstances require an extension of time for processing, in which event a decision will be rendered as soon as possible, but in no event later than 60 days after such receipt.  The decision of the Administrative Provider or Daily Administrator will be written in a manner calculated to be understood by the claimant and will include specific reasons for the decision and specific references to the pertinent Plan or Component Program Document provisions on which the decision is based.  If the claim is denied on first level review, the decision will also include an explanation of the Plan's claim procedure and of the Participant's right to elect binding arbitration as described in Section 11.2 or to bring a claim pursuant to section 502(a) of ERISA in the event of a final adverse benefit determination.  If the decision on first level review is not furnished within the time specified above, the claim will be deemed to be denied on first level review.

(d)     **Second Level Review**.  The Company has appointed the Committee as the final arbiter of benefit appeals.  Accordingly, the claimant may appeal a denial of his claim for benefits on first level review to the Committee within 60 days after receipt of the notice of the denial of the claim on first level review or 60 days from the date such claim is deemed to be denied on first level review.  In connection with the request for second level review, the claimant or his duly authorized representative may review pertinent documents and submit issues and comments in writing.  The claimant or his duly authorized representative (1) may contact the Daily Administrator to establish a mutually agreeable time during normal business hours of the Employer to review any pertinent documents and (2) will be provided upon request and free of charge, copies of all documents, records, and other materials relevant to the claim for benefits.

(e)     **Decision on Second Level Review**.  The Committee will issue a decision on second level review not later than 30 days after receipt of a request for review, unless special circumstances require an extension of time for processing, in which event a decision will be rendered as soon as possible, but in no event later than 60 days after such receipt.  The decision of the Committee will be written in

a manner calculated to be understood by the claimant and will include specific reasons for the decision and specific references to the pertinent Plan or Component Program Document provisions on which the decision is based. If the claim is denied on second level review, the decision will also advise the claimant of his right to elect binding arbitration or to bring an action under section 502(a) of ERISA. If the decision on second level review is not furnished within the time specified above, the claim will be deemed to be denied on second level review.

(f) **Exhaustion Required**. Completion of the claims procedures described in this Section 11.1 will be a condition precedent to commencing binding arbitration or any legal or equitable action regarding a claim for benefits under the Plan by a claimant, or by any other person or entity claiming rights through such claimant. However, the Committee may waive in writing this completion requirement.

## 11.2 Binding Arbitration

If the claim is still not resolved to the claimant's satisfaction after review by the Committee, the claimant may elect between submitting the matter to binding arbitration. or filing a case in state or federal district court. A claimant may choose to submit his claim to binding arbitration, but will not be forced to do so. A decision as to whether to submit a claim to binding arbitration will not affect the claimant's rights to any other benefits under the Plan or a Component Program. However, once the claimant elects binding arbitration, the decision is final and the claimant will not have the right to bring a lawsuit in court.

(a) **Timing**. A claimant may request binding arbitration in writing to the Committee within one year of his last appeal. This means that the claimant may contest the denial of his claim through arbitration only by submitting the matter to arbitration within this deadline. In this event, the claimant and the Committee will select an arbitrator from a list of names supplied by the American Arbitration Association ("**AAA**"), in accordance with the AAA's selection procedures, and the arbitration will be conducted in accordance with the AAA's commercial arbitration rules and procedures.

(b) **Venue**. The arbitration will be held in a major metropolitan area (closest to the claimant's place of employment), unless the claimant and the Committee agree to another site. The arbitrator's authority will be limited to the affirmation or reversal of the Committee's denial of the claim, based on whether the claim was denied arbitrarily or capriciously. The arbitrator does not have the power to alter, add to, or subtract from any provision of the Plan) and cannot interfere with the proper exercise of the Committee's discretion. In addition, the arbitrator does not have the authority to award extra-contractual, compensatory or consequential damages.

(c) **Final and Binding**. Except as otherwise required by applicable law, the arbitrator's decision will be final and binding between the claimant and the Plan, if warranted by the evidence and if reasonable based on applicable law and provisions of the Plan and may be filed with any court of competent jurisdiction. Arbitration decisions will not serve as precedent for any other claim unless the decision has been confirmed by a court of competent jurisdiction.

(d)     **Procedural Protections**.  The Plan will waive any right it may have to assert that the claimant failed to exhaust his administrative remedies if the claimant does not elect to submit a benefits dispute to binding arbitration; provided that the benefits dispute has been processed through the appeal process set forth in Section 11.1 (to the extent applicable).

Any statute of limitations or other timeliness defense the Plan may raise will be tolled during the time binding arbitration is pending.

Binding arbitration is available only after the final appeal stage of the claims procedures described in Section 11.1 (to the extent applicable).

(e)     **Information**.  Upon written request, the claimant will be provided sufficient information to make an informed judgment about whether to submit his claim to binding arbitration.

The claimant will not be required to pay any fees or costs associated with the binding arbitration offered under the Plan.  However, if the claimant chooses to be represented by an attorney during the binding arbitration process, he will be responsible for his attorney's fees. The arbitrator, as part of his award, may provide for the payment of such attorney's fees.

## 11.3    Payment of Benefits

(a)     **Time and Form of Payment**.  If the Administrative Provider, Daily Administrator or Committee determines that a claimant is entitled to a benefit hereunder, payment of such benefit will be made to such claimant (or commence, as applicable) as soon as administratively practicable after the date the Administrative Provider, Daily Administrator, or Committee determines that such claimant is entitled to such benefit or on such other date as may be established pursuant to the terms of the applicable Component Program and, in the absence of such terms in accordance with the following:

(i)     Any benefit assigned to a provider of services or to a former Spouse will be paid directly to such provider or former Spouse, or to the Participant, whichever the Administrative Provider, Daily Administrator or Committee chooses;

(ii)    Any benefit payable upon the death of a Participant, Spouse or Dependent will be paid to the estate of such person or to the designated beneficiary, whichever the Administrative Provider, Daily Administrator or Committee chooses;

(iii)   Any benefit payable with respect to a child covered by a qualified medical child support order (within the meaning of section 609 of ERISA)—other than a benefit described in Subparagraph (i) or (ii) above—will be paid to the custodial parent of such child, if the Administrative Provider, Daily Administrator or Committee so chooses; and

(iv)    Any other benefit payable will be paid to the Participant or Dependent (or in the case of a Dependent child, the Participant).

### 11.4   Authorized Representatives

An authorized representative may act on behalf of a claimant in pursuing a benefit claim or an appeal of a denial of a benefit claim.  An individual or entity will only be determined to be a claimant's authorized representative for such purposes if the claimant has provided the Committee with a written statement identifying such individual or entity as his authorized representative and describing the scope of the authority of such authorized representative.

If a claimant identifies an individual or entity as his authorized representative in writing to the Committee but fails to describe the scope of the authority of such authorized representative, the Committee will assume that such authorized representative has full powers to act with respect to all matters pertaining to the claimant's benefit claim under the Plan or appeal of a denial with respect to such benefit claim.

### 11.5   Compromise of Claims

A claim for benefits may be compromised on any terms acceptable to both the Participant and the Committee.

### 11.6   Limitations Period on Actions Against the Plan

A Claimant must bring any legal or equitable action to contest a final decision made with respect to a claim under this Article XI within 2 years of the date that the Committee (or the individual or entity who is responsible for issuing such final claims determination) sends written or electronic notification of such final claims determination to the Claimant, or the Claimant's right to bring such a legal or equitable action will be waived.

---

End of Article XI

## ARTICLE XII — FUNDING OF PLAN

**12.1    Source of Benefits**

In general, all contributions and benefits under the Plan are paid from the general assets of the Company. However, the Committee or Daily Administrator may decide to provide some or all of the benefits under a benefit program through insurance and may, or may cause the Plan to purchase one or more insurance contracts or policies for such purpose.

To the extent the benefits provided under the Plan are payable from the general assets of the Company, nothing in this Plan will require the Company, the Committee or the Daily Administrator to maintain any fund or segregate any amount for the benefit of any Participant (except to the extent required by law), and no Participant or other person will have any claim against, right to, or security or other interest in, any fund, account or asset of the Company from which any payment under the Plan may be made.

Plan benefits and expenses will first be paid out of assets attributable to Participant contributions and compensation reduction agreements; however, the Daily Administrator will not be required to separately account for such amounts.

**12.2    HMO and PPO Insurance Premiums**

HMO and PPO premiums will be paid to the applicable HMO or PPO from the Employer within the time required by the applicable Component Program or applicable HMO or PPO contract. All premiums will be paid within the time prescribed by Department of Labor regulation section 2510.3-102.

**12.3    Participant Contributions**

(a)    **Amount**. Participants' contributions will be determined by the Employer and will be communicated to the Employee at enrollment. Upon enrollment of a Participant in, amendment of coverage under, or enrollment of a Dependent in any Component Program, the Participant will be advised of any required contributions under that Component Program. Further, Participants' contributions may be changed by and in the sole discretion of the Employer (subject to the rules regarding changes in Participant contributions under the Cafeteria Component Programs), and each Participant will be advised of any change in the amount of contributions as provided in the applicable Component Program or, in the absence of such provision, in writing no later than 31 days prior to the effective date of the change. A COBRA Beneficiary will be required to contribute any additional amount determined in accordance with Section 5.6.

(b)    **Payment**. Participants will pay their contributions in the manner and within the time period set forth by the applicable Component Program.

(c)    **Certain Amounts Pre-Tax**. Subject to the terms and conditions set forth in Article IV regarding the Cafeteria Component Programs, Participants will be permitted to elect to pay for coverage under certain Component Programs on a pre-tax basis. If a Participant makes such an election, the Participant's Compensation will be reduced, and an amount equal to the reduction will be

contributed by the Employer and applied to the Participant's share of any cost of coverage under the applicable Component Program.

End of Article XII

## ARTICLE XIII — ADMINISTRATION OF PLAN

**13.1   Plan Administrator**

The Committee will be the Plan Administrator.  The general administration of the Plan will be vested in the Plan Administrator.  Except as otherwise provided in an insurance policy, HMO contract, or summary plan description, for purposes of ERISA, the Committee will be the "Plan Administrator" and the named "fiduciary" with respect to the Component Programs.  The duties and responsibilities of the Committee will be outlined in a Charter to be adopted by the Committee.

**13.2   Membership of the Committee**

The Committee will have no less than three members.  The Company's Senior Vice President of Human Resources will appoint a chairman of the Committee, who will hold office until resignation, death or removal by the Senior Vice President Chief Human Resources Officer.  All other Committee members may be appointed by the Committee Chairman or by the Company's Senior Vice President of Human Resources and will hold office until resignation, death or removal by the Senior Vice President of Human Resources or by the Chairman.  The Secretary of the Committee, who may or may not be a member of the Committee, will cause to be maintained in the office of the Committee, for the purpose of inspection, an accurate schedule listing the names of all persons from time to time serving as the named fiduciaries of the Plan.

**13.3   Appointment Authority of Committee**

The Committee may appoint a Daily Administrator to carry out its duties under the Plan. If so appointed the Daily Administrator will exercise all of the duties of the Committee specified in Section 13.5.  The Committee may also appoint an investment manager appointed pursuant to Section 13.19 exclusive fiduciary authority and discretion to manage and control all or any portion of the assets of the Plan.  In addition, the Committee, or Daily Administrator if one is appointed by the Committee, may delegate all or a portion of its administrative and/or fiduciary duties to an individual or entity as provided in Section 13.5.

**13.4   Discretion to Interpret Plan**

The Committee and Daily Administrator will have full and absolute discretion to construe and interpret all provisions of the Plan and the Component Programs, including the discretion to resolve ambiguities, inconsistencies, or omissions conclusively; provided, however, that all such discretionary interpretations and decisions will be applied in a uniform and nondiscriminatory manner to all Covered Persons who are similarly situated. All decisions of the Committee or Daily Administrator upon all matters within the scope of its authority will be binding and conclusive upon all persons.

**13.5   Powers and Duties**

In addition to the powers described in Section 13.1 and all other powers specifically granted under the Plan, the Committee will have all powers necessary or proper to administer the Plan and to discharge its duties under the Plan, and it will have full and absolute discretion in its exercise thereof.  The Committee has appointed the Daily Administrator to carry out the following powers and duties:

(a)     To make and enforce any rules, regulations, and procedures it deems necessary or proper for the orderly and efficient administration of the Plan;

(b)     To select and appoint an Administrative Provider as set forth in Section 13.17;

(c)     To purchase insurance contracts to insure the benefits under the Component Programs and enter into Administrative Agreements with Administrative Providers;

(d)     To direct and monitor the activities of the Administrative Providers;

(e)     To delegate its duties and responsibilities to any individual or entity;

(f)     Unless such authority is delegated to an Administrative Provider pursuant to Section 13.17, to interpret and decide all matters of fact in granting or denying claims for benefits under the Plan, (except for the decision on an appeal of a denial of benefits which pursuant to Article XI is vested in the Committee or an Independent Fiduciary), its interpretation and decision thereof to be final and conclusive on all persons claiming benefits under the Plan;

(g)     To determine eligibility under the terms of the Plan, its determination thereof to be final and conclusive on all persons;

(h)     Unless such authority is delegated to an Administrative Provider pursuant to Section 13.17, to determine the amount of and authorize the payment of benefits under the Plan, its determination and authorization thereof to be final and conclusive on all persons;

(i)     To prepare, distribute and/or file all applicable notices, reports, statements, and summary plan descriptions and other information explaining the Plan;

(j)     To obtain from the Employer, Employees, beneficiaries, and Dependents any information it deems necessary for the proper administration of the Plan;

(k)     To sue or cause suit to be brought in the name of the Plan, except to the extent such authority has been reserved by the Committee pursuant to its Charter;

(l)     To determine the manner in which the assets of this Plan, or any part thereof; will be held, invested, and disbursed; and

(m)     Subject to the provisions of Article XI, to establish a claims procedure, including a procedure for the review of any claims denied by an Administrative Provider.

**13.6    Committee Procedure**

A majority of the members of the Committee as constituted at any time will constitute a quorum, and any action by a majority of the members present at any meeting, or authorized by a majority of the members in writing without a meeting, will constitute the action of the Committee.  The Committee may designate certain of its members as authorized to execute any document or documents on behalf of the Committee and may designate certain Employees of the Company to act on behalf of the Plan.  The Company, Covered Persons, beneficiaries, and any other party dealing with the Committee may accept and rely upon any document executed by such designated

members as representing action by the Committee until the Committee revokes such authorization.

**13.7    Compensation of Committee and Plan Expenses**

Members of the Committee will serve as such without compensation unless the Company will otherwise determine, but in no event will any member of the Committee who is an employee receive compensation from the Plan for his services as a member of the Committee.   All members will be reimbursed for any necessary expenditures incurred in the discharge of duties as members of the Committee.  The compensation or fees, as the case may be, of all officers, agents, counsel, or other persons retained or employed by the Committee will be approved by the Committee.  The expenses incurred in the administration and operation of the Plan, including but not limited to the expenses incurred by the members of the Committee in exercising their duties, will be borne by the Plan, provided that the Company may pay such expenses on behalf of the Plan.

**13.8    Resignation and Removal of Members**

Any member of the Committee may resign at any time by giving written notice to the Committee Chairman and to the Company's Senior Vice President of Human Resources, effective as therein stated.   The Committee Chairman may be removed from the Committee or from the position of chairman, at any time, by the Senior Vice President of Human Resources.  Any other member of the Committee may, at any time, be removed by the Senior Vice President of Employee Benefits or by the Chairman.  If a member of the Committee who is an employee terminates employment, such person will no longer be a member of the Committee.

**13.9    Committee Membership Changes**

Upon the death, resignation or removal of the Chairman, the Senior Vice President of Human Resources will appoint a successor.  Upon the death, resignation or removal of any other Committee member, the Chairman or the Senior Vice President of Human Resources will appoint a successor.  Upon termination, for any reason, of a Committee member's status as a member of the Committee, such member's status as a named fiduciary will concurrently be terminated, and upon the appointment of a successor Committee member such successor will assume the status of a named fiduciary.

**13.10   Records**

The Committee will keep a record of all its proceedings and will keep, or cause to be kept, all such books, accounts, records or other data as may be necessary or advisable in its judgment for the administration of the Plan and properly to reflect the affairs thereof.

**13.11   Reliance Upon Documents and Opinions**

The members of the Committee, the Company, and any person delegated under the provisions of this Plan to carry out any fiduciary responsibilities under the Plan (hereinafter a "**delegated fiduciary**"), will be entitled to rely upon any tables, valuations, computations, estimates, certificates and reports furnished by any consultant, or firm or corporation which employs one or more consultants, and upon any opinions furnished by legal counsel.   The members of the Committee, the Company, and any delegated

fiduciary will be fully protected and will not be liable in any manner whatsoever for anything done or action taken or suffered in reliance upon any such consultant or firm or corporation which employs one or more consultants or counsel. Any and all things done or such actions taken or suffered by the Committee, the Company and any delegated fiduciary will be conclusive and binding on all employees, participants, dependents, beneficiaries, and any other persons whomsoever, except as otherwise provided by law. The Committee and any delegated fiduciary may, but are not required to, rely upon all records of the Company with respect to any matter or thing whatsoever, and may likewise treat such records as conclusive with respect to all employees, participants, dependents, and any other persons whomsoever except as otherwise provided by law.

**13.12   Requirement of Proof**

The Committee or the Company may require satisfactory proof of any matter under this Plan from or with respect to any Employee, Participant, beneficiary, or Dependent, and no such person will acquire any rights or be entitled to receive any benefits under this Plan until such satisfactory proof will be furnished as so required.

**13.13   Reliance on Committee Memoranda**

Any person dealing with the Committee may rely on and will be fully protected in relying on a certificate or memorandum in writing signed by a majority of members of the Committee, as constituted as of the date of such certificate or memorandum, or by the Senior Vice President of Human Resources if such certificate or memorandum specifically states that it is made on behalf of the Committee, as evidence of any action taken or resolution adopted by the Committee.

**13.14   Multiple Fiduciary Capacity**

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

**13.15   Indemnification**

To the fullest extent permitted by law, the Company will indemnify and hold each member of the Committee, and any other employee of the Company with duties under the Plan, harmless from and against any and all costs, liabilities, damages, and expenses (including any attorney's fees and any amount paid in settlement) reasonably incurred by him in connection with any claims against him by reason of the performance of his duties under the Plan, unless he has been found guilty, in a final nonappealable order by a court of competent jurisdiction, of willful misconduct in the performance of such duties. The foregoing right of indemnification will be in addition to any other right to which any such Committee member or other person may be entitled as a matter of law or otherwise.

**13.16   Bonding**

Except as is prescribed by the Committee or as provided in section 412 of ERISA, or as may be required under any other applicable law, no bond or other security will be required by any member of the Committee, or any other fiduciary under this Plan.

**13.17  Administrative Provider**

The Committee or Daily Administrator, as applicable, may select and appoint one or more Administrative Providers.  Subject to the direction and ultimate discretion of the Committee or Daily Administrator, as applicable, the Administrative Provider will have the duties and powers necessary to process claims and make payments under the Plan, including the following:

(a)    To act under the direction and control of the Committee or Daily Administrator, as applicable;

(b)    To receive, review, verify, and investigate all requests for distribution under the Plan;

(c)    In its discretion, to decide matters of fact, determine eligibility for benefits, and to determine the amount, manner, and timing of benefit payments under the Plan;

(d)    To inform the Committee or Daily Administrator, as applicable, as to the amount and timing of payments for benefits and expenses under the Plan;

(e)    To prescribe procedures to be followed by Participants in filing requests for distribution under the Plan;

(f)    To secure from the Employer, the Committee, the Daily Administrator, Covered Persons and their beneficiaries, as applicable, any information necessary for the proper processing and payment of distributions under the Plan;

(g)    To furnish the Employer, the Committee, and Daily Administrator, as applicable, upon request, with reasonable and appropriate reports with respect to the processing and payment of distributions under the Plan;

(h)    To maintain records relating to requests for distribution, processing of distributions, and payment or denial of requests for distribution; and

(i)    To do such other acts as may be necessary or requested by the Committee or Daily Administrator, as applicable, to handle the processing and payment of distributions under the Plan;

provided, however, that the Administrative Provider will have only those powers specifically designated by the Committee or Daily Administrator, as applicable, and set forth in the applicable Administrative Agreement.

**13.18  Plan Design**

The Company will have complete authority over all so-called settlor functions, including Plan design decisions, amount and type of benefits, and level of Participant contributions.  However, the Company may delegate all or any portion of such authority to its agents, including the Human Resources or the Health and Welfare Benefits Departments of the Company.

### 13.19  Investment Manager

The Company or Committee may appoint one or more Investment Managers, as defined in section 3(38) of ERISA, to manage all or a portion of the assets of the Plan. An Investment Manager will discharge its duties in accordance with applicable law and in particular in accordance with section 404(a)(1) of ERISA. An Investment Manager, when appointed, will have full power to manage the assets of the Plan for which it has responsibility, and neither the Company nor the Committee will thereafter have any responsibility for the management of such assets. An Investment Manager will serve at the pleasure of the Company or Committee and the Company or Committee will be entitled to remove an Investment Manager at any time.

---

End of Article XIII

## ARTICLE XIV — MANAGEMENT OF FUNDS

**14.1   Establishment of Trust**

To the extent either required by ERISA or other applicable law, or so desired by the Company, the Company may establish a trust to hold some or all of the assets of the Plan. The trustee of any trust established pursuant to this Section 14.1 will be appointed by either the Company or the Committee.

**14.2   Powers and Duties**

The powers of any trustee appointed pursuant to Section 14.1 above will be set forth in a trust agreement.

**14.3   Funding Policy and Method**

The Committee will have the responsibility for providing a procedure for establishing and carrying out a "funding policy and method" for the Plan consistent with the objectives of the Plan and the requirements of ERISA.

**14.4   Management of Assets**

Except as specifically provided in a trust agreement governing a trust established pursuant to Section 14.1, the Committee will have responsibility with respect to control or management of the Plan assets.

**14.5   Mistake of Fact Contributions**

In the case of any contribution of the Company to a trust established pursuant to Section 14.1 which is made by reason of mistake of fact, the excess of such contribution over the amount that would have been contributed had there not occurred a mistake of fact will be repaid to the Company, in whole or in part, within one year after the payment of contribution. With respect to contributions made to a trust established pursuant to Section 14.1 by reason of mistake of fact, (a) earnings attributable to the excess contribution will not be returned to the Company, and (b) losses attributable thereto will reduce the amount to be repaid.

_____

End of Article XIV

**ARTICLE XV — RESTRICTIONS REGARDING PROTECTED HEALTH INFORMATION**

15.1    **Purpose of Article**

The purpose of this Article XV is to cause the Plan (a) to adopt restrictions on uses and disclosures of PHI by the Company, (b) to provide for other rules and restrictions necessary for the Plan to comply with applicable laws regarding the privacy of PHI, and (c) to establish disciplinary rules regarding violations of the privacy requirements regarding PHI or of the Plan's privacy policies and procedures.  This Article XV is to be construed and interpreted in accordance with such purposes.

15.2    **Scope of Article**

The Plan is a "hybrid entity," as such term is defined in section 164.504 of the HIPAA Regulations which requires among other things that (a) the Plan designate those of its components that constitute "health care components," as such term is defined in section 164.504 of the HIPAA Regulations, (b) document such designation as required pursuant to section 164.530(j) of the HIPAA Regulations and (c) establish adequate separation between such health care components and the non-health care components as required by section 164.504 of the HIPAA Regulations.  The terms of this Article XV will only apply with respect to the designated Health Care Components of the Plan identified in Section 1.1(mm) of the Plan.  References in this Article XV to the "Plan" will be deemed to be a reference to the Health Care Components of the Plan, including any other group health plans or plans providing "health care" within the meaning of HIPAA that (i) are sponsored by the Company and (ii) provide that they will constitute, along with the Health Care Components of the Plan, a single covered entity for purposes of compliance with the Privacy Rules and the HIPAA Regulations.  In addition, certain capitalized terms used in this Article that are not defined herein will have the meaning ascribed to such terms under the HIPAA Regulations.

15.3    **Provision of PHI to the Company Pursuant to an Authorization**

The Plan may at any time disclose to and the Company may use and disclose PHI received from the Plan if such disclosure and use is pursuant to and in accordance with a valid authorization from the individual who is the subject of such information.

15.4    **Provision of SHI or Enrollment Information to the Company**

The Company may receive, use, and disclose PHI from the Plan if the information consists solely of SHI and only if the Company certifies to the fiduciaries of the Plan (*i.e.,* the Committee) that the information is being requested for one or more of the following:

(a)    For the purpose of enabling the Company to obtain premium bids from health insurers for providing health insurance coverage under the Plan;

(b)    For purposes of determining whether and, if so, how to modify or amend the Plan;

(c)    For purposes of determining whether and, if so, how to terminate the Plan, in whole or in part; or

(d)   For such other purposes consistent with the HIPAA Regulations as may be necessary for the administration of the Plan.

The Company may receive, use, and disclose PHI from the Plan if the information consists of enrollment or disenrollment information (*i.e.,* indicates whether the individual is participating in the Plan, or is enrolled in or has disenrolled from a health insurance issuer or health maintenance organization offered under the Plan).

**15.5   General Provision of PHI to the Company**

The Company may receive PHI from the Plan and use such PHI if (a) the Company certifies in writing to the Plan's fiduciaries (*i.e.,* the Committee) that the Plan incorporates the restrictive provisions described in items (i) through (x) below and the separation requirements described in Section 15.6, and (b) except as described in Sections 15.3 and 15.4, the Company agrees to comply with the following restrictions and requirements regarding the PHI that is provided by the Plan to the Company:

(i)    The Company will not use or further disclose the information other than as permitted or required by the Plan documents or as required by law or the HIPAA Regulations as set forth in the Privacy Manual;

(ii)   The Company will ensure that any agents, including a subcontractor, to whom it provides PHI received from the Plan agree to the same restrictions and conditions that apply to the Company with respect to such information;

(iii)  The Company will not use or disclose the information for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Company;

(iv)   The Company will report to the Plan any use or disclosure of the information that is inconsistent with the uses or disclosures provided for of which it becomes aware;

(v)    The Company will make available to Covered Persons PHI in accordance with section 164.524 of the HIPAA Regulations as set forth in the Privacy Manual;

(vi)   The Company will agree to requests by Covered Persons to restrict the use or disclosure of PHI as required by HIPAA or the HIPAA Regulations and as set forth in the Privacy Manual;

(vii)  The Company will provide Covered Persons with the right to amend their PHI and will incorporate any amendments to Covered Persons' PHI in accordance with section 164.526 of the HIPAA Regulations as set forth in the Privacy Manual;

(viii) The Company will provide Covered Persons with an accounting of disclosures of their PHI for reasons other than treatment, payment or health care operations or pursuant to an authorization in accordance with section 164.528 of the HIPAA Regulations as set forth in the Privacy Manual;

(ix)   The Company will make its internal practices, books and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of Health and Human Services for purposes of determining compliance by the Plan with the HIPAA Regulations;

(x)    If feasible, the Company will return or destroy all PHI received from the Plan that the Company still maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made, or, if such return or destruction is not feasible, the Company will limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible;

(xi)   The Company will ensure the adequate separation required pursuant to Section 15.6; and

(xii)  The Company will notify the Plan of any "Breach" (as defined in section 13400(1) of the Health Information Technology for Economic and Clinical Health Act of 2009) by the Company or an agent of the Company without unreasonable delay and in no case later than sixty (60) calendar days of the discovery of the Breach.

## 15.6   Adequate Separation

At all times, there will be adequate separation between (a) the Plan and the Company and (b) the Health Care Components and the Non-Health Care Components in accordance with the requirements imposed pursuant to section 164.504(f)(2)(iii) and section 164.504(c)(2) of the HIPAA Regulations.  In order to comply with such adequate separation requirements:

(i)    Except as described in Sections 15.3 and 15.4, the only employees, classes of employees or other persons under the control of the Company to be given access to PHI disclosed to the Company or who receive PHI relating to treatment or payment under the health care operations of, or other matters pertaining to the health care components of, the Plan in the ordinary course of business are: (A) those individuals employed by or providing services to the Company's Corporate Health and Welfare Department which deals with the administration, enrollment and processing of benefit claims under the health care components of the Plan, (B) the Plan's fiduciaries (*i.e.,* the members of the Committee), (C) the Plan's Privacy Officer, (D) the Plan's Contact Person, and (E) the Company's internal legal counsel.  In addition, those employees providing services to the Company's Payroll or Human Resources Departments may receive information as to whether an individual is enrolled in the Plan, the benefit options selected by the individual under the Plan and information as to when the individual disenrolls from the Plan.

(ii)   The access to and use by the Company and the individuals described in item (i) above is restricted to (A) the Plan administration functions that the Company performs in connection with the operation and administration of the Health Care Components of the Plan (including, but not limited to, assisting employees, spouses or dependents with enrollment or claims issues, negotiating with Administrative Providers, obtaining payment for

benefits under the Plan, and procuring or obtaining reimbursement under a stop-loss insurance policy with respect to the Plan), (B) the plan sponsor functions with respect to which the Company is entitled to receive SHI pursuant to Section 15.4, (C) uses and disclosures described in an authorization by the Covered Person, and (D) uses and disclosures that are described to Covered Persons in the "Notice of Privacy Practices for Tenet Employee Benefit Plan Participants and Their Covered Spouse and Dependents," as required by section 164.520 of the HIPAA Regulations.

(iii)   In the event that any person described in item (i) of this Section 15.6 fails to comply with any of the requirements of this Section 15.6 or of Section 15.5, the noncompliance will be reported to the Privacy Officer in a report describing the name of the noncompliant person and a summary of the details regarding such person's noncompliance.  Upon receipt of such report, the Privacy Officer will solicit a response from the person who has been reported as noncompliant, giving such person the opportunity to contest the charge of noncompliance or to offer justification or other reasons why sanctions should not be imposed with respect to the noncompliance.  The Privacy Officer will, after considering all details, facts and circumstances relating to an alleged act of noncompliance for which sanctions may be imposed pursuant to this item (iii), determine if a sanction should be imposed (which sanction may range from a warning to recommended dismissal from employment).  Upon determination of a sanction and if the sanction may be imposed under the authority of the Privacy Officer, the sanction will be imposed.  If the sanction requires action of the Company, the Privacy Officer will confer with the appropriate managers of the Company.  If the Company, following consideration of a proposed sanction from the Plan's Privacy Officer for noncompliance with the requirements of Sections 15.5 and 15.6 by a person or entity, determines not to impose such sanction, the Company will advise the Privacy Officer.  In such event, the Privacy Officer must consider and propose an alternative sanction for the noncompliant person or entity.

**15.7   Privacy Officer**

The Committee will appoint a Privacy Officer for the Plan.  The Committee may remove the Plan's then existing Privacy Officer at any time upon written notice provided that the Committee has appointed a successor Privacy Officer to serve.  The Plan's Privacy Officer's duties and responsibilities focus upon the operation and administration of the Plan in connection with HIPAA and the HIPAA Regulations (including activities conducted via the services of insurers, Business Associates, and employees and agents of the Company) and the activities of the Company regarding the Plan in its capacity as sponsor of the Plan.   In order to carry out such general powers, duties and responsibilities, the Plan's Privacy Officer will have the following specific powers, duties and responsibilities:

(a)   To develop and propose to the Plan fiduciaries (*i.e.*, the Committee) a comprehensive privacy policy for the Plan which when finalized will be set forth in the Privacy Manual.

(b)   To perform initial and periodic privacy risk assessments with respect to the Plan.

(c)     To develop and maintain appropriate authorization forms, information notices and materials reflecting the Plan's legal practices and requirements regarding the privacy of PHI.

(d)     To develop and implement initial and ongoing privacy training and orientation to all employees of the Company who may have access to PHI in connection with the Plan.

(e)     To oversee the development, implementation and ongoing compliance of all Business Associate agreements with the Plan.

(f)     To establish with Company management and operations a mechanism to identify all of the Company's plans and benefit arrangements which are "covered entities" for purposes of the laws governing PHI.

(g)     To establish rules to determine when to allow Covered Persons to review or receive a report on their PHI privacy activity under the Plan.

(h)     To work cooperatively with the Company's Health and Welfare Department, other applicable Company offices/personnel and Business Associates in overseeing Covered Persons' rights to inspect, amend and restrict access to their PHI when appropriate.

(i)     To establish and administer a complaint procedure pursuant to which Covered Persons may redress alleged violations of their privacy rights.

(j)     To apply sanctions for a failure to comply with the privacy provisions of the Plan, the terms of the Privacy Manual, HIPAA or the HIPAA Regulations as specified in this Article XV.

(k)     To review system-related information security plans maintained by the Company to the extent necessary or appropriate.

(l)     To serve as information privacy consultant to the Company with respect to the Plan.

**15.8    Contact Person**

As provided in the Privacy Manual, the Committee will appoint a Contact Person (which may be the same individual or entity as is serving as the Privacy Officer).   The Committee may remove the Plan's then existing Contact Person at any time upon written notice provided that if the Committee has not appointed a successor Contact Person to serve, the Privacy Officer will serve as the Contact Person.   The Contact Person will have the duties and responsibilities set forth in the Privacy Manual.

**15.9    Disciplinary Proceedings**

The purpose of this Section 15.9 is to establish appropriate disciplinary sanctions and proceedings as required by the HIPAA Regulations.

(a)     Any complaint brought pursuant to the Plan's complaint procedures which involves an alleged failure to comply with HIPAA, the HIPAA Regulations, the terms of this Article XV or the Privacy Manual will be referred to the Privacy

Officer for consideration as to disciplinary sanctions and proceedings under this Section 15.9.

(b)    Similarly, if the Privacy Officer becomes aware of any other failure to comply with HIPAA, the HIPAA Regulations, the terms of this Article XV or the Privacy Manual, the Privacy Officer will consider whether such matter is appropriate for disciplinary sanctions and proceedings under this Section 15.9.

(c)    If the complaint or other failure involves the actions of a Business Associate, the appropriate disciplinary sanctions and proceedings will be conducted under the terms of the Business Associate agreement.  If the complaint or other failure involves the actions of the individuals responsible for the administration of the Plan identified in Section 15.6(i), the appropriate disciplinary sanctions and proceedings will be conducted under Section 15.6(iii).  If the complaint or other failure involves the actions of any other Company employee or any agent of the Company, the appropriate disciplinary sanctions and proceedings will be conducted under this Section 15.9.

(d)    In the case of either an unresolved complaint or other failure described in (a), the Privacy Officer will solicit a response from the person or agent who has been reported as noncompliant, giving the person or agent the opportunity to contest the charge of noncompliance or to offer justification or other reasons why disciplinary sanctions should not be imposed with respect to the noncompliance.

(e)    The Privacy Officer will, after considering all details, facts and circumstances relating to such an alleged act of noncompliance, determine if a disciplinary sanction is warranted (which sanction may range from a warning to dismissal from employment, or in the case of an agent, termination of the agency agreement).  Upon determination of a disciplinary sanction and if the sanction may be imposed under the authority of the Privacy Officer, the disciplinary sanction will be imposed.

(f)    If the disciplinary sanction requires approval of the Company, the Privacy Officer will confer with the appropriate managers of the Company.  If the Company, following consideration of a recommended disciplinary sanction from the Privacy Officer, determines not to impose such disciplinary sanction, the Company will advise the Privacy Officer.  In such event, the Privacy Officer must consider and propose an alternative disciplinary sanction for the noncompliant person or agent.  The Privacy Officer will ensure that the imposed disciplinary sanction is adequately communicated to the violator and is enforced.

(g)    In the event that a disciplinary sanction triggers any rights of appeal (for instance, under a collective bargaining agreement), all such rights of appeal will be available to the violator.  In the case of any such appeal proceedings, the identity of the individual whose privacy rights were violated will be removed to the extent feasible.

## 15.10   Implementation Authority

The Company will have the authority to enter into and enforce on behalf of the Plan such contracts and agreements (including, specifically, Business Associate agreements) as

may be appropriate or necessary to cause the Plan to satisfy its obligations under HIPAA and the HIPAA Regulations.

**15.11  Indemnification**

The Company will indemnify and hold harmless each employee of the Company who is identified in Section 15.6 as a person who is to be given access to or receive PHI against any and all expenses and liabilities arising out of such employee's administrative functions or fiduciary responsibilities in connection with violations of HIPAA and the HIPAA Regulations, including but not limited to, any expenses and liabilities that are caused by or result from an act or omission constituting the negligence of such employee in the performance of such functions or responsibilities, but excluding expenses and liabilities arising out of such employee's own gross negligence or willful misconduct.  Expenses against which such person will be indemnified include, but are not limited to, the amounts of any settlement, judgment, costs, counsel fees, and related charges reasonably incurred in connection with a claim asserted or a proceeding brought.   This Section 15.11 will not, however, apply to, and the Company will not indemnify against, any expense that was incurred without the consent or approval of the Company, unless such consent or approval has been waived in writing by the Company. This Section will also not apply to any sanctions or disciplinary action imposed pursuant to Section 15.9.

---

End of Article XV

**ARTICLE XVI – SECURITY OF ELECTRONIC PROTECTED HEALTH INFORMATION**

16.1   **Purpose of Article**

The purpose of this Article XVI is to (a) cause the Plan to implement security measures designed to ensure the confidentiality, integrity, and availability of all ePHI created, received maintained, or transmitted to or by the Plan, (b) cause the Plan to require that the Company will reasonably and appropriately safeguard ePHI created, received maintained, or transmitted to or by the Company on behalf of the Plan, and (c) establish the office of Security Officer, who will be responsible for the Plan's Security Standards compliance.  This Article XVI is to be construed and interpreted in accordance with such purposes.

16.2   **Scope of Article**

The Plan is a "hybrid entity," as such term is defined in section 164.504 of the HIPAA Regulations which requires among other things that (a) the Plan designate those of its components that constitute "health care components," as such term is defined in section 164.504 of the HIPAA Regulations, (b) document such designation as required pursuant to section 164.530(j) of the HIPAA Regulations and (c) establish adequate separation between such health care components and the non-health care components as required by section 164.504 of the HIPAA Regulations.  The terms of this Article XVI will only apply with respect to the designated Health Care Components of the Plan identified in Section 1.1(mm) of the Plan.  References in this Article XVI to the "Plan" will be deemed to be a reference to the Health Care Components of the Plan, including any other group health plans or plans providing "health care" within the meaning of HIPAA that (i) are sponsored by the Company and (ii) provide that they will constitute, or have been designated by the Committee as constituting, along with the Health Care Components of the Plan, a single covered entity for purposes of compliance with the Privacy Rules and the HIPAA Regulations.  In addition, certain capitalized terms used in this Article that are not defined herein will have the meaning ascribed to such terms under the HIPAA Regulations.

16.3   **Implementation of Security Standards**

The Plan will do all of the following in accordance with the HIPAA Regulations:

(a)   The Plan will ensure the Confidentiality, Integrity, and Availability of all ePHI that it creates, receives, maintains or transmits;

(b)   The Plan will protect against any reasonably anticipated threats or hazards to the Security or Integrity of such information;

(c)   The Plan will protect against any reasonably anticipated uses or disclosures of such information that are not permitted or required under the Privacy Rules;

(d)   The Plan will ensure compliance with the Security Standards by its Workforce;

(e)   The Plan will implement each Security Standard and implementation specification thereunder that is designated as "Required" in the HIPAA Regulations and/or Appendix A to Subpart C of Part 146 thereof, as provided in the Security Manual;

(f)  The Plan will take the following steps with regard to each Security Standard and implementation specification thereunder that is designated as "Addressable" in the HIPAA Regulations, as provided in the Security Manual:

    (i)  The Plan will assess whether each implementation specification in the Security Standard is a reasonable and appropriate safeguard in its environment, when analyzed with reference to the likely contribution to protecting the Plan's ePHI; and

    (ii)  As applicable to the Plan, the Plan will implement the implementation specification if reasonable and appropriate or, if implementing the implementation specification is not reasonable and appropriate:

        (A)  Document why it would not be reasonable and appropriate to implement the implementation specification; and

        (B)  Implement an equivalent alternative measure if reasonable and appropriate;

(g)  The Plan will ensure that its Business Associate contracts comply with the requirements of section 164.314 of the HIPAA Regulations; and

(h)  The Plan will periodically review the Security Measures implemented to comply with the Security Standards and modify such measures as needed in order to continue provision of reasonable and appropriate protection of ePHI as described in the Security Manual.

## 16.4  Provision of Electronic Protected Health Information to the Company

The Company may receive and use ePHI only if (a) the Company certifies to the Plan's fiduciaries that the Plan has been amended to incorporate the provisions of this Section 16.4, and (b) the Company agrees to comply with and enforce the following restrictions and requirements regarding the ePHI that is provided by the Plan to the Company:

(a)  The Company will implement Administrative, Physical and Technical Safeguards that reasonably and appropriately protect the Confidentiality, Integrity, and Availability of the ePHI that it creates, receives, maintains, or transmits on behalf of the Plan as required by the HIPAA Regulations as set forth in the Security Manual;

(b)  The Company will ensure that the adequate separation required pursuant to Section 15.6 is supported by reasonable and appropriate Security Measures as required by the HIPAA Regulations as set forth in the Security Manual;

(c)  The Company will ensure that any agent, including a subcontractor, to whom it provides ePHI that it creates, receives, maintains or transmits on behalf of the Plan agrees to implement reasonable and appropriate Security Measures to protect such information; and

(d)  The Company agrees to report to the Plan any Security Incident of which it becomes aware in accordance with the HIPAA Regulations as set forth in the Security Manual.

**16.5    Implementation of Administrative Safeguards**

The Plan will in accordance with section 164.308 of the HIPAA Regulations:

(a)    Implement policies and procedures to prevent, detect, contain and correct security violations.

(b)    Perform initial and periodic assessments of the potential risks and vulnerabilities to the Confidentiality, Integrity and Availability of ePHI held by the Plan.

(c)    Implement Security Measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level.

(d)    Develop appropriate sanctions policies and procedures and apply appropriate sanctions against members of the Plan's Workforce who fail to comply with the terms of this Article XVI.

(e)    Implement procedures to regularly review records of Information System activity, such as audit logs, access reports, and Security Incident tracking reports.

(f)    Implement policies and procedures to ensure that all members of the Plan's Workforce have appropriate access to ePHI, as provided in the Security Manual, and to prevent those Workforce members who do not have access thereunder from obtaining access to ePHI.

(g)    Implement policies and procedures for authorizing access to ePHI that are consistent with the applicable requirements of the Privacy Rules.

(h)    Implement a security awareness and training program for all members of the Plan's Workforce (including management).

(i)    Implement policies and procedures to address Security Incidents.

(j)    Identify and respond to suspected or known Security Incidents; mitigate, to the extent practicable, harmful effects of Security Incidents that are known to the Plan; and document Security Incidents and their outcomes.

(k)    Establish (and implement as needed) policies and procedures for responding to an emergency or other occurrence that damages systems that contain ePHI.

(l)    Establish and implement procedures to create and maintain retrievable exact copies of ePHI.

(m)    Establish (and implement as needed) procedures to restore any loss of data.

(n)    Establish (and implement as needed) procedures to enable continuation of critical business processes for protection of the security of ePHI while operating in emergency mode.

(o)    Perform a periodic technical and nontechnical evaluation, based initially upon the standards implemented under the Security Standards and subsequently in response to environmental or operational changes affecting the security of ePHI,

that establishes the extent to which the Plan's security policies and procedures comply with the Security Standards.

(p)     Oversee the implementation and compliance of the security provisions of all Business Associate agreements with the Plan, to ensure that the Plan's Business Associates will appropriately safeguard ePHI created, received, maintained or transmitted on behalf of the Plan.

(q)     Implement policies and procedures to limit physical access to the Plan's Information Systems and the Facility or Facilities in which they are housed, while ensuring that properly authorized access is allowed.

(r)     Review all other Security Standards and implementations specifications that are identified as Addressable under section 164.308 of the HIPAA Regulations and not specifically described above to determine their appropriateness for the Plan and implement the same or a modification thereof.

## 16.6   Implementation of Physical Safeguards

The Plan will in accordance with section 164.310 of the HIPAA Regulations:

(a)     Implement policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed, and the physical attributes of the surroundings of a specific Workstation or class of Workstation that can access ePHI.

(b)     Implement Physical Safeguards for all Workstations that access ePHI, to restrict access to authorized Users.

(c)     Implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain ePHI into and out of the Facility, and the movement of these items within the Facility.

(d)     Implement policies and procedures to address final disposition of ePHI, and/or the hardware or Electronic Media on which it is stored.

(e)     Implement procedures for removal of ePHI from Electronic Media before the media are made available for re-use.

(f)     Review all other Security Standards and implementations specifications that are identified as Addressable under section 164.310 of the HIPAA Regulations and not specifically described above to determine their appropriateness for the Plan and implement the same or a modification thereof.

## 16.7   Implementation of Technical Safeguards

The Plan will in accordance with section 164.312 of the HIPAA Regulations:

(a)     Implement technical policies and procedures for electronic information systems that maintain ePHI to allow access only to those persons or software programs that have been granted access rights in accordance with the Security Standards.

(b)     Assign unique names and/or numbers for identifying and tracking the identity of Users of the Plan's ePHI.

(c)     Establish (and implement as needed) procedures for obtaining necessary ePHI during an emergency.

(d)     Implement hardware, software, and/or procedural mechanisms that record and examine activity in Information Systems that contain or use ePHI.

(e)     Implement policies and procedures to protect ePHI from improper alteration or destruction.

(f)     Implement procedures to verify that a person or entity seeking access to ePHI is the one claimed.

(g)     Implement technical Security Measures to guard against unauthorized access to ePHI that is being transmitted over an electronic communications network.

(h)     Review all other Security Standards and implementations specifications that are identified as Addressable under section 164.312 of the HIPAA Regulations and not specifically described above to determine their appropriateness for the Plan and implement the same or a modification thereof.

**16.8    Implementation of Policies and Procedures and Documentation Requirements**

The Plan will in accordance with section 164.316 of the HIPAA Regulations:

(a)     Implement reasonable and appropriate policies and procedures to comply with the standards, implementation specifications, or other requirements of the Security Standards, taking into account (i) the size, complexity, and capabilities of the Plan, (ii) the Plan's technical infrastructure, hardware, and software security capabilities, (iii) the costs of the Security Measures, and (iv) the probability and criticality of potential risks to ePHI.

(b)     Maintain in written or electronic form the policies and procedures implemented by the Plan to comply with the provisions of this Article XVI as required by the Security Standards.

(c)     Maintain in written or electronic form records of any actions, activities or assessments taken by the Plan that are required by this Article XVI or the Security Standards to be so maintained.

(d)     Retain the documentation required by this Article XVI for a period of six (6) years from the date of its creation or the date when it was last in effect, whichever is later.

(e)     Make the documentation required by this Article XVI available to those members of the Plan's Workforce responsible for implementing such policies and procedures.

(f)     Periodically review the Plan policies and procedures and update them as needed in response to environmental or operational changes affecting the security of ePHI.

**16.9    Security Officer**

The Committee will appoint a Security Officer for the Plan.  The Committee may remove the Plan's then existing Security Officer at any time upon written notice provided that the Committee has appointed a successor Security Officer to serve.  The Plan's Security Officer's duties and responsibilities focus upon the operation and administration of the Plan in connection with the Security Standards, HIPAA, and the HIPAA Regulations (including activities conducted via the services of insurers, Business Associates, and employees and agents of the Company) and activities of the Company regarding the Plan in its capacity as sponsor of the Plan.

**16.10   Implementation Authority**

The Company will have the authority to enter into and enforce on behalf of the Plan such contracts and agreements (including, specifically, Business Associate agreements) as may be appropriate or necessary to cause the Plan to satisfy its obligations under HIPAA and the HIPAA Regulations.

**16.11   Indemnification**

The Company will indemnify and hold harmless each member of the Plan's Workforce who has access to or receive ePHI against any and all expenses and liabilities arising out of such employee's administrative functions or fiduciary responsibilities in connection with violations of HIPAA and the HIPAA Regulations, including but not limited to, any expenses and liabilities that are caused by or result from an act or omission constituting the negligence of such employee in the performance of such functions or responsibilities, but excluding expenses and liabilities arising out of such employee's own gross negligence or willful misconduct.  Expenses against which such person will be indemnified include, but are not limited to, the amounts of any settlement, judgment, costs, counsel fees, and related charges reasonably incurred in connection with a claim asserted or a proceeding brought.  This Section 16.11 will not, however, apply to, and the Company will not indemnify against, any expense that was incurred without the consent or approval of the Company, unless such consent or approval has been waived in writing by the Company.

_____
End of Article XVI

## ARTICLE XVII — FMLA COVERAGE

**17.1    FMLA Compliance**

To the extent required by the FMLA, each Health Care Component that is a group health plan within the meaning of section 5000(b)(1) of the Code or section 607(1) of ERISA (*i.e.,* the Medical Benefit Program component (includes all insured and self-funded medical benefits provided), the Dental Benefit Program component, the Vision Benefit Program component, and the Health Care Spending Account component) will provide for continuation of coverage and reinstatement of coverage for a Participant and his eligible Covered Dependents if such Participant takes a leave of absence from the Employer pursuant to the rights afforded him under the FMLA and complies with the requirements imposed upon him under the FMLA and Section 3.6 of this Plan as a condition to such rights.   The provisions of this Article XVII will supersede and entirely replace any provisions regarding requirements under the FMLA which are in a Component Program Document to the extent that such provisions in the Component Program Document conflict with this Article XVII.

_____
End of Article XVII

**ARTICLE XVIII — USERRA**

18.1    **USERRA Compliance**

To the extent required by USERRA, each Health Care Component that is a "health plan," as defined by section 4303(7) of USERRA (*i.e.*, a Health Care Component providing health services), will provide for continuation of coverage and reinstatement of coverage for a Participant and his eligible Covered Dependents if such Participant takes a leave of absence from the Employer for "services in the uniformed services," as defined by section 4303(13) of USERRA and complies with the requirements imposed upon him under USERRA and Section 3.6 of this Plan.   The provisions of this Article XVIII will supersede and entirely replace any provisions regarding requirements under USERRA which are in a Component Program Document to the extent that such provisions in the Component Program Document conflict with this Article XVIII.

———————————
End of Article XVIII

## ARTICLE XIX — AMENDMENT AND TERMINATION OF PLAN

### 19.1   Right to Amend

Benefits under the Plan are neither "vested" nor "accrued." The Company, acting either through its Board of Directors or any authorized officer, expressly reserves the right to amend, modify or discontinue the Plan at any time, thereby to terminate any rights, benefits or claims under the Plan which had not actually been incurred as of the date of such amendment, modification or termination. In addition, the Committee and  the Daily Administrator, may amend the Plan if such amendment either (a) is deemed necessary or appropriate to comply with applicable law, or (b) does not have a material adverse cost affect on the Company. Any oral statements or representations made by the Employer, an Administrative Provider, or any other individual or entity that alter, modify, amend, or are inconsistent with the written terms of the Plan will be invalid and unenforceable and may not be relied upon by any Participant, Employee, beneficiary, Dependent, service provider, or other individual or entity.

### 19.2   Right to Terminate; Automatic Termination

The Employer hopes and expects to continue the Plan. However, notwithstanding any provision of any other communication, either oral or written, made by the Employer, the Committee, an Administrative Provider, or any other individual or entity to employees, to any service provider, or to any other individual or entity, the Company reserves the absolute and unconditional right to terminate the Plan and any Component Programs, in whole or in part, on behalf of itself and each Participating Employer.

### 19.3   Effect of Amendment or Termination

If the Plan is amended or terminated, each Covered Person and beneficiary will have no further rights hereunder and the Employer will have no further obligations hereunder, except as otherwise specifically provided under the terms of the Plan and each Component Program; provided, however, that no modification, alteration, amendment, suspension, or termination will be made that would diminish any vested accrued benefits arising from incurred but unpaid claims of Covered Persons or beneficiaries existing prior to the effective date of such modification, alteration, amendment, suspension, or termination.

### 19.4   Merger or Consolidation

If the Employer does not survive any dissolution, merger, consolidation, or reorganization, the Plan will terminate with respect to the Employer and its employees unless the Plan is continued by the successor to the Employer and such successor agrees to be bound by the terms and conditions of the Plan.

---

End of Article XIX

## ARTICLE XX — MISCELLANEOUS PROVISIONS

### 20.1   No Guarantee of Employment

Nothing herein will alter the presumption of employment at will.  Nothing herein will be construed to be a contract between the Employer and an Employee, or to be consideration for or an inducement of the employment of any Employee by the Employer. Nothing herein will grant any Employee the right to be retained in the service of the Employer or limit in any way the right of the Employer to discharge or terminate the service of any Employee at any time, without regard to the effect such discharge or termination may have on any rights under the Plan.

### 20.2   Assignment and Payment of Benefits

Rights and benefits under the Plan will not be assignable, either before or after services and supplies are provided; provided, that a Participant or Covered Dependent may direct that benefit payments be made directly to a medical provider.  Further, in the absence of a written agreement with a Provider, the Plan reserves the right to make benefit payments to the provider or the Participant or Covered Dependent. Payment to either party discharges the Plan's responsibility to the Participant or Covered Dependents for benefits available under the Plan.  The fact that benefit payment is directed or made directly to the Provider will not give the Provider status as a Participant, and any dispute regarding the amount of such payment must be resolved by the Participant through the Plan's internal claims procedure (i.e., the Provider may not invoke the internal claims procedure on behalf of the Participant or Covered Dependent).  In addition, once covered services have been rendered by a Provider, the Participant or Covered Dependent has no right to request that the Plan not pay such provider.

### 20.3   Payments to Minors and Incompetents

If a Covered Person entitled to receive any benefits under the Plan is a minor, is determined by the Committee to be incompetent, or is adjudged by a court of competent jurisdiction to be legally incapable of giving valid receipt and discharge for benefits provided under the Plan, the Committee may pay such benefits to the duly-appointed guardian or conservator of such person or to any third party who is authorized (as determined by the Committee) to receive any benefit under the Plan for the Covered Person.  Such payment will fully discharge all liabilities and obligations of the Committee under the Plan with respect to such benefits.

### 20.4   No Vested Right to Benefits

No Covered Person nor anyone claiming through such Covered Person will have any right to or interest in any benefits hereunder, except as specifically provided herein.

### 20.5   Non-alienation of Benefits

Except as provided in Section 3.5(d) (regarding QMCSO coverage), Section 20.8 (regarding incorrect information), Section 20.2 (regarding assignment and payment of benefits) and Section 20.10 (regarding reimbursement for excess benefit payments), or except as the Committee may otherwise permit by rule or regulation, no interest in or benefit payable under the Plan will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt by a

Covered Person to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same will be void and of no effect; nor will any interest in or benefit payable under the Plan be in any way subject to any legal or equitable process, including garnishment, attachment, levy, seizure, or lien.  This provision will be construed to provide each Covered Person, or other person claiming any interest or benefit in the Plan through a Covered Person, with the maximum protection afforded such Covered Person's interest in the Plan (and benefits thereunder) by law against alienation or encumbrance, and against any legal and equitable process, including attachment, garnishment, levy, seizure, or lien.

**20.6    Unknown Whereabouts**

Each Participant will inform the Committee or its delegate of his current mailing address which will also serve as the current mailing address of his Covered Dependents and beneficiaries.  If a Participant fails to inform the Committee of his current mailing address, neither the Committee, any Administrative Provider, nor the Employer will be responsible for any late payment or loss of benefits, nor for failure of any notice to be provided or provided timely under the terms of the Plan to such individual.  In addition, any communication, statement or notice addressed to a Participant at the last mailing address provided by such Participant to the Daily Administrator will be binding upon such person for all purposes of the Plan, and the Daily Administrator will not be obligated to search for or ascertain the whereabouts of any such Participant.  In the event that the Daily Administrator is unable to locate a Participant or beneficiary to whom a payment is due, that amount will be forfeited.

**20.7    Notice and Filing**

Any notice, administrative form, or other communication required to be provided to, delivered to, or filed with the Committee will include provision to, delivery to, or filing with any person or entity designated by the Committee to be an agent for the disbursement and receipt of administrative forms and communications.  Except as otherwise provided herein, where such provision, delivery, or filing is required, it will be deemed given or made only upon actual receipt of such notice, administrative form, or other communication by the Committee or designee.  Unless otherwise provided by law, any notice or other document sent by the Employer, the Committee, or an Administrative Provider will be deemed given or made when deposited in the mail, when entrusted to a courier or delivery service, or when sent by telefax or other electronic means. Any notice required hereunder may be waived by the person entitled to the notice.

**20.8    Incorrect Information, Fraud, Concealment, or Error**

(a)    **Recovery Due to Errors**.  If because of a human or systems error, or because of incorrect information provided by or correct information failed to be provided by fraud, misrepresentation, or concealment of any relevant fact (as determined by the Committee) by any Covered Person, beneficiary, or other individual, the Plan: enrolls any individual in a Component Program; provides continuation coverage pursuant to Article III; pays a claim under the Plan; incurs a liability for failure to enroll, provide continuation coverage, or pay a benefit claim, or for terminating enrollment or continuation coverage; or makes any overpayment or erroneous payment, the Committee will be entitled to recover from such Covered Person, beneficiary, or other individual the benefit paid or the liability incurred, together with all expenses incidental to or necessary for such recovery.  This recovery

       may be by whatever means the Committee chooses, including by offset against benefits otherwise properly due hereunder.

(b)    **No Diminished Right to Benefits.**  Human or systems error will not deprive an Employee or a Dependent of coverage or affect the amount of benefits to which a Covered Person or beneficiary is otherwise entitled under the terms of the Plan.

## 20.9    Medical Responsibilities

With regard to Component Programs providing medical and other health-related benefits, all responsibility for medical decisions concerning any treatment, drug, service, or supply for a Covered Person rests with the Covered Person and such person's treating physician.    Neither the Employer, the Plan, the Committee, the Daily Administrator nor an Administrative Provider has any responsibility for any such medical decision or for any act or omission of any physician, hospital, pharmacist, nurse, or other provider of medical goods or services; each may rely upon the representations of any physician, hospital, pharmacist, nurse, or other provider of goods or services without any duty to verify independently the truth of such representations.    A decision concerning any treatment, drug, service, or supply, or any other decision made by a Covered Person or medical provider, will in no way affect the decision by the Committee or Daily Administrator or its delegate whether a benefit is payable under the Plan with respect to such treatment, drug, service, or supply.

## 20.10    Reimbursement of Company for Excess Benefit Payment

If, due to error or otherwise, an individual receives a benefit payment under this Plan any portion of which is in excess of the benefit, if any, to which the individual may be entitled under the terms of the Component Program Document, such individual will reimburse the Plan or Company for the full amount of the excess benefit payment.    Such individual will also hold the Plan and Company harmless for any liability either of them may incur for a failure to withhold federal or state income taxes or payroll taxes from the excess benefit payment.    If the individual fails to repay the Company or Plan for the excess benefit payment, the Plan will be entitled to recover such excess benefit payment by reducing the amount of any future benefit payments to which the individual or any member of his family may be entitled under the Plan.

## 20.11    Electronic Administration

The Plan may be administered electronically by use of telephonic and/or computer resources.    It is specifically contemplated that, where the Plan refers to communications such as designations, writings, notices, elections, and the like, these communications may occur electronically pursuant to such procedures as the Committee may establish.

## 20.12    Required Documentation

Whenever the Plan requires or permits a Participant to give notice to the Plan or to the Company, or to make an election or apply for coverage or payment of benefits or otherwise to communicate with the Plan or the Company or representative of either of said parties ("**Plan Communication**"), the Committee or Daily Administrator may impose reasonable requirements regarding the form and timing of any such Plan Communication including, but not limited to, the use of standard forms, and the imposition of requirements that any such Plan Communication be delivered not less than

a reasonable period of time prior to the effective date of any such Plan Communication, and may require the Participant to provide substantiation of information related to Plan participation. Such forms and other requirements, including requirements regarding substantiation of information, may be changed from time to time by the Committee, Daily Administrator or authorized personnel in the Health and Welfare Benefits Department of the Company and such personnel similarly may approve forms or requirements imposed by third parties engaged to provide services to the Plan.

**20.13   No Reliance**

Benefits under the Plan are payable only to the extent provided by the Plan document and such other documents as are contemplated by this instrument to be a part of this Plan. No Participant or assignee will be entitled to rely on any verification of coverage or description of coverage given or alleged to have been given to such person which is inconsistent with the terms of the Plan.

**20.14   Execution of Receipts and Releases**

Any payment to or on behalf of any Participant or to his dependent, beneficiary or legal representative ("**payee**"), in accordance with the provisions of the Plan, will to the extent thereof be in full satisfaction of all claims hereunder against the Plan, Committee, and Company. The Committee may require such payee, as a condition precedent to such payment, to execute a receipt and release therefor in such form as the Committee will determine.

**20.15   No Conversion Privilege**

Except as provided in an insurance policy which serves as a Component Program Document, Participants will have no right or ability to convert coverage provided under the Plan to an individual policy upon terminating participation in the Plan.

**20.16   Addresses, Notices, Waiver or Notice**

Each Participant must file with the Daily Administrator (or its authorized agent) in writing his post office address. Any communication, statement or notice addressed to such person at his last post office address as filed with the Daily Administrator will be binding upon such person for all purposes of the Plan, and the Daily Administrator will not be obligated to search for or ascertain the whereabouts of any such person. Any benefit mailed to a Participant at such address may be deemed forfeited by the Participant if not claimed within one year of mailing. Any notice required hereunder may be waived by the person entitled to notice.

**20.17   Entire Plan**

This document (together with any other documents incorporated by reference herein) constitutes the entire Plan and there are no oral terms or conditions to the contrary. Any change, modification, or amendment to the Plan must be in writing and signed by the Company, Committee, Daily Administrator, or a designated agent thereof, as appropriate.

_____
End of Article XX

**APPENDIX A**

**TENET EMPLOYEE BENEFIT PLAN**

Effective January 1, 2020, the following Component Programs, with the exception of the Health Savings Accounts, are incorporated into and made a part of the Plan:

- Medical Benefit Program*

- Prescription Drug Program*

- Dental Benefit Program*

- Employee Assistance Program*

- Disability Benefit Program*

- Supplemental Income Protection Program*

- Long-Term Care Benefit Program*

- Health Care Spending Account*

- Dependent Day Care Spending Account*

- Health Reimbursement Account Program

- Vision Benefit Program*

- Life Benefit Program* - amount ≤ $50 excl. from GI

- AD&D Benefit Program*

- Critical Illness Insurance*

- Accident Insurance *

- Business Travel Accident Benefit Program*

- Health Savings Accounts Established by HSA Eligible Participants***

As provided in Section 1.1(p) of the Plan, this Appendix A may be updated from time to time without a formal amendment to the Plan.

_____

\*    ERISA Plan Number 515

\*** These are individual accounts maintained by Eligible Participants that are not part of the Plan.  The Plan simply allows Eligible Participants to make pre-tax contributions to such Health Savings Accounts under the Cafeteria Component Program.  As such no Form 5500 reporting is required for the Health Savings Accounts.

## APPENDIX B

## TENET

### IMPORTANT — ACTION NEEDED

This notice must be completed and returned to the Benefit Solutions Center **within 31 days** or Domestic Partner coverage will be
**dropped** retroactively to the coverage begin date.

### CRITERIA FOR DOMESTIC PARTNERSHIP STATUS
### (for purposes of obtaining group health plan coverage)

A group health plan sponsored by Tenet for its employees (a "**GHP**") that extends coverage to dependents will provide coverage to a "**Domestic Partner**" (as defined in this **Appendix B**) of an "**Employee**," as defined below, pursuant to the terms and conditions described herein, if all of the applicable requirements are met. This **Appendix B** may be updated from time to time without formal amendment to the Plan.

### PART A - DOMESTIC PARTNERSHIP DEFINED

***A Domestic Partnership is defined as follows:***

For purposes of the GHPs, a Domestic Partnership consists of an employee of Tenet ("**Employee**") and one other person of the same or opposite sex (a "**Domestic Partner**"). Such persons must satisfy the following requirements:

Each partner must be the other's sole domestic partner and must intend to remain so indefinitely. The partners must have an exclusive mutual commitment similar to that of marriage and:

(a)     Each partner must be at least 18 years of age or, if lower, the age at which a person may be legally married in the state in which the partners share the same permanent address;

(b)     The partners must share the same permanent residence and have done so for at least 12 months;

(c)     The partners cannot be related by blood to a degree that would prohibit marriage;

(d)     The partners cannot be legally married to anyone else or in a domestic partnership with another individual nor have had another domestic partner within the prior six months;

(e)     The partners must share the same permanent address and must be able to provide their driver's licenses listing the common address;

(f)     The partners must share joint financial responsibility for basic living expenses, including food, shelter and coverage expenses;

(g)     The partners must each be mentally competent to consent to contract; and

(h)     The partners must be financially interdependent, demonstrated by at least two of the following:

    (1)     Ownership of a joint bank account; ownership of a joint credit account; or evidence of joint obligation on a loan;

    (2)     Common ownership of a motor vehicle;

    (3)     Joint ownership of a residence; or evidence of a joint mortgage or lease;

    (4)     Evidence of common household expenses, *e.g.* utility, phone;

    (5)     Execution of wills naming each other as executor and/or beneficiary;

    (6)     Granting each other durable powers of attorney;

    (7)     Designation of each other as beneficiary under a retirement benefit account; or

    (8)     Evidence of other joint financial responsibility.

Notwithstanding the foregoing, a Domestic Partner of an Employee will be eligible for coverage under any GHP offering coverage to domestic partners if the Domestic Partnership has been registered with any state or local government registry recognizing domestic partnerships (and the Domestic Partnership meets the requirements of such registry) or if the domestic partners have entered into a legal civil union in any state recognizing civil unions. Effective September 16, 2013, an Employee's legal same-sex Spouse (as such term is defined in the Tenet Employee Benefit Plan) is eligible for coverage as a Spouse (and not as a Domestic Partner) under any GHP offering Spousal coverage.

### *Dependent Children of Domestic Partner include the following individuals:*

Dependent Child(ren) of a Domestic Partner are eligible for coverage under any GHP that provides dependent coverage when they are:

(a)     Unmarried,

(b)     Primarily dependent on the Employee for support, and

(c)     Meet the eligibility requirements of the GHP (including the requirement that such child be the federal tax dependent of the Employee).

### *Obtaining Domestic Partner Coverage:*

In order to obtain Domestic Partner coverage, the Employee and Domestic Partner must complete and file with Benefit Solutions Center, the **Affidavit Declaring Domestic Partnership**, attached hereto. Such form must be filed at annual enrollment. If the **Affidavit Declaring Domestic Partnership** is not filed during an annual enrollment period, coverage for the Domestic Partner will not begin until after the next annual enrollment period, unless the Domestic Partner loses other group health coverage during the plan year and is entitled to a mid-year entry under the plan's HIPAA special enrollment provisions that apply in the case of a loss of other group health coverage. Further, mid-year enrollment of a Domestic Partner as a

Life Event is not permitted by federal law, unless the Domestic Partner qualifies as the Employee's federal tax dependent.

To the extent that the Domestic Partner has a dependent child or children, such children may be enrolled pursuant to the terms of the GHP at the same time the Domestic Partner is enrolled; provided, the child(ren) satisfy the definition of Dependent Child above. A Dependent Child may also be entitled to mid-year enrollment under the plan's HIPAA special enrollment provisions that apply in the case of acquisition of a child or a loss of other group health coverage. A Dependent Child may also be entitled to mid-year enrollment on account of a Life Event.

***Termination of a Domestic Partnership:***

(a)     Each Employee with a Domestic Partner has an obligation to notify Benefit Solutions Center, by filing the **Declaration of Termination of Domestic Partnership** (attached hereto), if there is any change in the Domestic Partnership status as attested to in the **Affidavit Declaring Domestic Partnership** that would terminate such partnership (such as the death of a Domestic Partner, a change in residence of one partner, termination of the relationship, etc.). **The Employee must notify Benefit Solutions Center within thirty-one (31) days of such change in the Domestic Partnership.**

(b)     Upon termination of the Domestic Partnership, the GHP coverage of the Domestic Partner who is not an Employee as well as coverage of any dependent child(ren) of such Domestic Partner will cease, unless the dependent child(ren) continue to satisfy the definition of Dependent Child under the GHP (*i.e.*, are unmarried and primarily dependent on the Employee for support and meet the eligibility requirements of the plan). Termination of such coverage (obtained as a result of completion of the **Declaration of Termination of Domestic Partnership**) will be effective on the date the relationship ends as indicated on such form.

(c)     In the event a Domestic Partnership is terminated for reasons other than death of a Domestic Partner, an Employee cannot re-enroll for Domestic Partnership coverage under any Tenet GHP until 6 months from the date the Domestic Partnership ended.

***COBRA coverage upon termination of Domestic Partnership:***

(a)     **Domestic Partner**. Under federal law, COBRA is only available to qualifying employees and their qualifying spouses and dependent children. Thus, a Domestic Partner may not elect COBRA in his or her own right. However, an Employee on COBRA may add a Domestic Partner to a Tenet GHP in the same manner as is permitted for active employees. In the event an Employee who is a COBRA beneficiary dies or becomes Medicare entitled, or the Domestic Partnership is terminated, the Employee's Domestic Partner (or former Domestic Partner) may not make an election under the Tenet GHP pursuant to COBRA as a second qualifying event.

(b)     **Dependent Children**. If dependent coverage of the dependent child(ren) of the Domestic Partner ends under a Tenet GHP because such child(ren) cease to satisfy the definition of Dependent Child under such plan, such child(ren) will be eligible to elect COBRA.

## PART B - TAX CONSEQUENCES

**_Possible Tax Implications of Domestic Partner Coverage:_**

There may be federal income tax implications associated with providing coverage under a Tenet GHP to domestic partners.  For example, if the Domestic Partner does not qualify as your dependent under section 152 of the Internal Revenue Code (determined without regard to sections 152(b)(1), (b)(2), and (d)(1)(B)), the fair market value of the Domestic Partner coverage will be includible in your income as wages for federal income tax purposes. Similar tax implications may apply for state income tax purposes. However, GHP coverage provided to your Domestic Partner may qualify for exclusion from income for state income tax purposes based on state law. Exemption from state income tax is often conditioned on the relationship being registered or the parties having entered into a civil union. It is your responsibility to determine the requirements of your state. Please consult with your tax advisor prior to making a declaration of Domestic Partnership.

**_Proof of Tax-Qualified Status of Domestic Partnership:_**

Domestic Partner coverage under Tenet's GHPs will be provided on an after-tax basis for both federal and state income tax purposes **unless** you provide proof at the time of enrollment that your Domestic Partner qualifies as your dependent under section 152 (determined without regard to sections 152(b)(1), (b)(2), and (d)(1)(B)) of the Internal Revenue Code for federal income tax purposes or qualifies for pre-tax-coverage under state law. If this proof is not provided at enrollment, your Domestic Partner coverage under Tenet's GHPs will be provided on an after-tax basis for both federal and state income tax purposes.

**TENET**

**Please return this form to Benefit Solutions Center**

**AFFIDAVIT DECLARING DOMESTIC PARTNERSHIP**
**(for purposes of obtaining coverage)**

We, _____ ("**Employee**") and _____
("**Domestic Partner**") are domestic partners (*i.e.*, have a "**Domestic Partnership**"). We have
read and understand the above **Criteria for Domestic Partnership Status**, which summarizes
the eligibility requirements for Domestic Partner coverage under Tenet's group health plan (a
"**GHP**").

1.   We declare that we meet the applicable eligibility requirements described in **Criteria for
     Domestic Partnership Status** and desire to obtain Domestic Partner coverage under a
     Tenet GHP. In the event that the Domestic Partner has a child or children that meet the
     definition of Dependent Child described above, we understand that we may also enroll
     such child(ren) in the GHP pursuant to its terms. We acknowledge that such Domestic
     Partner coverage will not be available if the GHP does not provide dependent coverage.
     We further acknowledge in requesting coverage that we will provide to Benefit Solutions
     Center satisfactory proof that we qualify as a Domestic Partnership, as defined in the
     **Criteria for Domestic Partnership Status**.

2.   We have provided the information required by the **Criteria for Domestic Partnership
     Status** and are signing this **Affidavit Declaring Domestic Partnership** for use by Tenet
     for the sole purpose of determining our eligibility for Domestic Partner benefits under
     Tenet's GHP. We understand and agree that Tenet is not legally required to extend such
     benefits. We understand that the information provided in this **Declaration of Domestic
     Partnership** will be treated as confidential by Tenet and the service providers for the
     Tenet GHP but will be subject to disclosure; a) upon the express written authorization of
     the undersigned Employee or Domestic Partner, b) upon request of the insurer or plan
     administrator, or c) if otherwise required by law.

3.   We understand that we will be required to reimburse the GHP and/or Tenet for any
     benefits paid under the GHP by reason of any false statement contained in this **Affidavit
     Declaring Domestic Partnership** or for failure to timely notify Benefit Solutions Center
     of changed circumstances that would terminate this **Affidavit Declaring Domestic
     Partnership** and that Tenet or the GHP may bring a civil action against one or both of us
     to recover such amounts (as well as attorneys' fees and costs). We further understand
     that the Employee could be subject to disciplinary action, including discharge from
     employment, for falsification of information in this **Affidavit Declaring Domestic
     Partnership** or a failure to notify Benefit Solutions Center of changed circumstances
     pursuant to the requirements of this **Affidavit Declaring Domestic Partnership**.

4.   We certify that the Domestic Partner __ is ___ is not (select one) the Employee's
     dependent within the meaning of section 152 (without regard to sections 152(b)(1),
     (b)(2), and (d)(1)(B)) of the Internal Revenue Code. *(We understand that to qualify as a
     dependent within the meaning of section 152 (without regard to sections 152(b)(1),
     (b)(2), and (d)(1)(B)) of the Internal Revenue Code, the Domestic Partner must be an
     individual over half of whose support, for the calendar year in which the Employee's
     taxable year begins, was received from the Employee and who, for the Employee's*

*taxable year has as his or her principal place of abode the Employee's home and is a member of the Employee's household. We further understand that to qualify as the Employee's dependent within the meaning of section 152 (without regard to sections 152(b)(1), (b)(2), and (d)(1)(B)) of the Internal Revenue Code, the relationship between the Employee and Domestic Partner cannot be prohibited by law.) (Attached is proof of dependent status)*

5.  We certify that the Domestic Partner __ is eligible __ is not eligible *(select one)* to receive health coverage on a pre-tax basis under state law. *(Attached is proof of such eligibility (e.g., proof of a registered domestic partnership or civil union under state law)).*

6.  We understand that this **Affidavit Declaring Domestic Partnership** may have legal implications relating to, for example, ownership of property or taxability of benefits provided. We understand that before signing this **Affidavit Declaring Domestic Partnership**, we should seek competent legal advice concerning such matters. To the extent that the Domestic Partner qualifies as a dependent (within the meaning of section 152 (without regard to sections 152(b)(1), (b)(2), or (d)(1)(B)) of the Internal Revenue Code, as described in item 4 above) or is eligible to receive health coverage on a pre-tax basis under state law (as described in item 5 above) such that benefits under the GHP may be provided on a pre-tax basis for purposes of federal and/or state law, we have so indicated.

7.  We acknowledge that with respect to Tenet's GHPs, the Employee (and the Domestic Partner in the event that he or she is also an employee of Tenet) will not be permitted to request dependent coverage for a new domestic partner until at least *6 months* after this Domestic Partnership has ended (as stated in the **Declaration of Termination of Domestic Partnership**), except in the event of the death of the Domestic Partner.

8.  We acknowledge that we have been advised to consult a tax advisor or our attorney regarding the implications of filing this **Affidavit Declaring Domestic Partnership**.


_____          _____
Signature—Employee                       Signature— Domestic Partner


_____          _____
Date                                     Date


_____          _____
Printed Name                             Printed Name


_____-___-_____
Employee's Social Security Number

Subscribed and sworn to me this _____ day      Subscribed and sworn to me this _____ day
of _____, 20_____.               of _____, 20_____.
Witness my hand and official seal.                Witness my hand and official seal.


[SEAL]                                            [SEAL]




My commission expires: _____          My commission expires: _____
Notary Public: _____     Notary Public: _____


Mail form to:

Benefit Solutions Center
P.O. Box 5929
Hopkins, MN 55343
Fax: 1-833-253-0583

This **Appendix B** may be updated from time to time without formal amendment to the Plan.

**TENET**

**Please return this form to Benefit Solutions Center**

**DECLARATION OF TERMINATION OF DOMESTIC PARTNERSHIP FORM**

I, _____ (the "**Employee**"), certify and declare that (the "**Former Domestic Partner**") and I are no longer domestic partners as of __/__/__ (the "**Termination Date**").

I understand that coverage under Tenet's group health plan (the "**GHP**") for the Former Domestic Partner will terminate effective as of the Termination Date.

1.  I make and file this Declaration of Termination of Domestic Partnership in order to cancel the Affidavit Declaring Domestic Partnership filed with Tenet on __/__/__.

2.  Termination of the Affidavit Declaring Domestic Partnership is due to:

    __ Termination of domestic partnership
    __ No longer jointly responsible for each other's common welfare and living expenses
    __ Death of domestic partner

I understand that with respect to any of Tenet's GHPs another **Affidavit Declaring Domestic Partnership** cannot be filed until **six (6) months** from the date the relationship ends (as indicated above) except with respect to death of my Former Domestic Partner.

In the event that termination of this relationship is not due to the death of my Former Domestic Partner, I will mail my Former Domestic Partner a copy of this notice to the following address:

_____
_____
_____
**(Former Domestic Partner new address)**

I affirm, under penalty of perjury, that the above statements are true and correct.

_____        __/__/____        __/__/__
Signature of Employee                Date of Birth        Date

_____
Printed name

Mail form to:

Benefit Solutions Center
P.O. Box 981903
El Paso, TX 79998
Fax: 1-833-253-0583

This **Appendix B** may be updated from time to time without formal amendment to the Plan.

## APPENDIX C

### TENET EMPLOYEE BENEFIT PLAN

Effective January 1, 2020, the following Affiliates are not Participating Employers in the Plan.

| AFFILIATE | EFFECTIVE DATE OF NON-PARTICIPATION IN PLAN |
|---|---|
| Olive Branch Urgent Care, LLC | December 27, 2016 |
| West Boynton Urgent Care, LLC | December 27, 2016 |
| NUCH of Texas | December 27, 2016 |
| NUCH of Michigan, Inc. | December 27, 2016 |
| NUCH of Massachusetts | December 27, 2016 |
| NUCH of Georgia, LLC | December 27, 2016 |
| | |
| | |
| | |
| | |

As provided in Section 1.1(ggg) of the Plan, this Appendix C may be updated from time to time without a formal amendment to the Plan.